**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| EXPORTADORA ATLANTICO, S.A. | CIVIL ACTION |
| Plaintiff, | |
| v. | Case No. |
| FRESH QUEST, INC., XELA ENTERPRISES, LTD,, TROPIC INTERNATIONAL, LTD., FRESH QUEST MELON, LLC, AGROEXPORTADORA MUNDIAL, S.A., ALAN GUTTMAN, JUAN G. GUTIERREZ, MARK KOROL, JUAN .A. GUTIERREZ, CALVIN K. SHIELDS, and MARIA BOFILL, each individually, | |
| Defendants. | |

## COMPLAINT

For its Complaint, the plaintiff respectfully states as follows:

<u>THE PARTIES</u>

1.      Exportadora Atlantico, S.A. ("*Plaintiff*") is a Guatemalan corporation with farming operations in Asuncion Mita, Guatemala and its principal place of business located at Avenida Reforma 13-70 Zona 9, Oficina 8a, Guatemala, Guatemala.

2.      Plaintiff raises primarily Cantaloupe melon and Honeydew Melon for marketing and sale in, *inter alia*, the United States.

3.      Both Cantaloupe and Honeydew Melon are commodities the United States Department of Agriculture ("*USDA*") expressly recognize as commodities covered under the provisions of the Perishable Agricultural Commodities Act, 1930, *as amended*, 7 U.S.C. 499a-499t (2015) ("*PACA*").

4.      Plaintiff sells wholesale quantities of perishable agricultural commodities (hereinafter "*Produce*") in foreign commerce.

5.      Plaintiff raises or grows and packs Produce for marketing and sale in, *inter alia*, the United States, and, therefore is a "grower" of Produce as defined by PACA.

6.      Plaintiff only sells Produce of its own raising and does not purchase Produce from third parties for resale.

7.      Defendants are:

(a)      Fresh Quest, Inc. ("*Company*") is a Florida corporation with its principal place of business located at 1580 Sawgrass Corporate Pkwy., Suite 140, Sunrise, Florida 33323 and is a direct or indirect subsidiary of Xela Enterprises, Ltd.  At all times relevant to this action, Company:

(i)      operated, conducted, and otherwise was engaged in or carried on the business of buying and selling Produce in interstate and foreign commerce;

(ii)      operated, conducted, and otherwise was engaged in or carried on the business, in whole or in part, of buying and selling Produce as a single vertically integrated farming operation that includes, *inter alia*, Agro Mundial;

(iii)      operated, conducted, and otherwise was engaged in or carried on the business, in whole or in part, of its direct or indirect parent company, Xela Enterprises, Ltd. and was therefore a "Permanent Establishment" of its parent company as defined in the U.S. – Canada Income Tax Convention;

(iv)      committed certain tortious acts, as set forth herein, within the State of Florida;

(v)     received and re-sold Plaintiff's Produce within, *inter alia*, the State of Florida and in the ordinary course of its Produce related business;

(vi)    on or about August 15, 2013, entered into a marketing agreement with Plaintiff within the State of Florida, which was amended by Addendum I dated September 16, 2014;

(vii)   breached the terms of its Marketing Agreement with Plaintiff within the State of Florida by, *inter alia*, failing to perform acts required by the contract to be performed in Florida; and

(viii)  received in excess of 18,700 pallets or 1.3 million cases of Produce from Plaintiff for resale within the United States and, therefore is or was engaged in substantial business activity within the State of Florida.

(b)     Xela Enterprises, Ltd. ("Xela") is a Canadian entity with its principal place of business located at 2225 Sheppard Ave. East, Suite 1200, North York, Ontario M2J 5C2 and, at all relevant times to this action,:

(i)     is or was the direct and indirect parent to Company, Topic and/or Agro Mundial;

(ii)    is or was in a position to exercised dominion and control of Company, Tropic and/or Agro Mundial and in fact did exercise domination and control over such entities as alleged herein;

(iii)   utilized Company, Tropic and/or Agro Mundial to operate, conduct, and to otherwise engage in or carry on, in whole or in part, its business of marketing "melons and other crops to North America;"

(iv)    exercised dominion and control over Company, Tropic and/or Agro Mundial and directed, supervised, managed, or ratified those entitys' actions as set forth herein;

(v)    exercised direct control over Company's President, Guttmann;

(vi)    had the power to and failed to prevent the wrongful actions as set forth herein;

(vii)    conspired with and participated in the tortious and other wrongs set forth herein;

(viii)    upon information and belief1, Xela's representatives routinely visited the State of Florida to manage, direct, or oversee Company's business operations; and

(ix)    upon information and belief, Xela's Board of Director meetings were held in the State of Florida, Canada and Guatemala.

(c)    Argoexportadora Mundial, S.A, ("Agro Mundial") is upon information and belief a Guatemalan entity with its principal place of business located at Finca La Puntilla, San Nicolas, Estanzela, Zacapa, Guatemala and, at all relevant times to this action,:

(i)    is or was the direct or indirect subsidiary of Xela and an affiliate of the Company;

---

[1] On or upon "information and belief," as used herein, means Plaintiff is informed and believes a fact or condition to be true and, upon such information and belief, alleges the fact or condition in connection with the instant complaint. Plaintiff's information and beliefs are, upon investigation, derived from such sources as: Plaintiff's conversations with Defendants, certain of Defendants' current or former employees, news articles, publicly available government documents, relevant statements or information contained on Defendant owned or controlled websites, court pleadings involving Defendants, various declarations and affidavits filed in relevant court proceedings involving Defendants, Plaintiff's communications with Defendants, Plaintiff and Defendants relevant documents, and relevant third party documents.

(ii)     operated, conducted, and otherwise was engaged in or carried on the business of buying and selling Produce in interstate and foreign commerce;

(iii)    operated, conducted, and otherwise was engaged in or carried on the business, in whole or in part, of buying and selling Produce as a single vertically integrated farming operation that includes, inter alia, the Company and Xela;

(iv)    was listed, together with various certificates in its name, as a grower on the Company's website; and

(v)     conspired with and participated in the tortious or other wrongs set forth herein.

(d)     Tropic International, Ltd. ("*Tropic*"), on information and belief, is a Canadian entity with its principal place of business located at 2225 Sheppard Ave. East, Suite 1200, North York, Ontario M2J 5C2 and, at all relevant times to this action,:

i.      is or was the direct or indirect subsidiary of Xela and/or is or was under the dominion and control by Xela, Juan and/or Arturo as alleged herein;

ii.     operated, conducted, and otherwise was engaged in or carried on the business of buying and selling Produce in interstate and foreign commerce;

iii.    operated, conducted, and otherwise was engaged in or carried on the business, in whole or in part, of buying and selling Produce as a single vertically integrated farming operation that includes, *inter alia*, the Company, Agro Mundial and Xela;

iv.     was listed as a principal on the Company's PACA license;

v.      conspired with and participated in the tortious or other wrongs set forth herein;

(e)      Juan G. Gutierrez ("*Juan*"), is or was an employee[2], officer, director, shareholder, or otherwise an agent of Company, Tropic, Xela, and/or Agro Mundial and in a position to exercised dominion and control of such entities at all times relevant to this action and conspired with and participated in the tortious or other wrongs set forth herein. Upon information and belief, Juan was also listed as a principal on the Company's PACA license.

(f)      Alan Guttmann ("*Guttmann*"), a Florida resident, is or was an officer, director, or shareholder of Company and in a position to exercised dominion and control of Company at all times relevant to this action and conspired with and participated in the tortious or other wrongs set forth herein.  Upon information and belief, at all times relevant hereto, the Company employed Guttmann as its President and he was listed as a principal on the Company's PACA license and he reported directly to the President of Xela and its Board of Directors.

(g)      Calvin K. Shields ("*Shields*"), a Florida resident, is or was an officer, director, shareholder, or otherwise an agent of Company and was in a position to exercised dominion and control of Company at all times relevant to this action and conspired with and participated in the tortious or other wrongs set forth herein.  Upon information and belief, at all times relevant hereto Company employed or otherwise associated with Shields as a Director.

---

[2] "Employed," "employ," or "employment," as used herein, means "any affiliation of any person with the business operations of a licensee, with or without compensation, including ownership or self-employment."  *See* 7 C.F.R. § 46.2(ee).

(h)      Mark Korol ("*Korol*"), on information and belief a Florida resident, is or was an employee, officer, director, or shareholder of Company, Tropic and/or Xela, and was in a position to exercised dominion and control of such entities at all times relevant to this action and conspired with and participated in the tortious or other wrongs set forth herein.  Upon information and belief, at all times relevant hereto Company and Xela each employed Korol as its respective Chief Financial Officer.

(i)      Juan Arturo Gutierrez ("*Arturo*"), is or was the patriarch of the Family Business and an employee, officer, director, shareholder, or otherwise an agent of Company and in a position to exercised dominion and control of the Company, Xela, Tropic and Agro Mundial at all times relevant to this action and conspired with and participated in the tortious or other wrongs set forth herein.  Upon information and belief, at all times relevant hereto Company employed or otherwise associated with Arturo as its Chairman of the Board and a Director.  Arturo was also listed as a principal on the Company' PACA License.

(j)      Maria Bofill ("*Bofill*"), a Florida resident, is or was an employee, officer, director, shareholder, or otherwise an agent of Company and in a position to exercised dominion and control of Company at all times relevant to this action conspired with and participated in the tortious or other wrongs set forth herein.  Upon information and belief, at all times relevant hereto Company employed or otherwise associated with Bofill as its corporate Treasurer and Director of Finance and Administration.

(k)      Fresh Quest Melons, LLC ("*FQM*"), a Florida limited liability corporation with its principal place of business located at 1410 S.W. 8th Street, Pompano Beach, Florida 33069 and, on information and belief, FQM:

        (i)       was organized on October 20, 2015 for the purpose of, *inter alia*, acquiring all or substantially all of Company's assets, including, but not limited to, its intellectual property (i.e., federally registered trademarks) and is continuing the Company's business;

        (ii)      is the recorded assignee of Company's "entire interest" in and to its "Fresh Quest" word trademark, which the United States Patent And Trademark Office ("*USPTO*") identifies as Reg. # 424494 and Serial No. 85446939

        (iii)     is the recorded assignee of Company's "entire interest" in and to its Fresh Quest logo, which the USPTO identifies as Reg. # 2354697 and Serial No. 75570695;

        (iv)     obtained a PACA license No. 20160162 from the USDA on November 12, 2015 in order to purchase and sell Produce in interstate or foreign commerce using the "Fresh Quest" trade name;

        (v)      is managed by many of the same officers, directors, shareholders, members, or entities as Sol Group Marketing Company, Fyffes Tropical Produce LLC, and Fyffes, Inc., and;

        (vi)     is a successor-in-interest of Company.

Xela, Tropic, *Juan*, *Guttmann*, *Shields*, *Korol*, *Arturo*, and *Bofill* hereinafter collectively the "*Principals*."

8.      Company, Agro Mundial and the Principals shall hereinafter be collectively referred to as "*Defendants*."  At all times relevant hereto, Company bought and sold wholesale quantities of Produce in interstate and foreign commerce.

9.      At all times relevant hereto, each of the Defendants were engaged, directly or indirectly, in the business of purchasing and/or selling Produce in wholesale or jobbing quantities and, therefore, are "dealers" of Produce as defined by PACA.

10.     At all times relevant hereto, each of the Defendants were engaged in the business, directly or indirectly, of negotiating sales and purchases of Produce in interstate or foreign commerce for or on behalf of a vendor or purchaser, respectively, and, therefore, are "brokers" of Produce as defined by the PACA.

11.     At all times relevant hereto, each of the Defendants were engaged in the business, directly or indirectly, of purchasing Produce from growers or others and distributing such Produce in commerce by resale or other methods, and, therefore, are "shippers" of Produce as defined by the PACA.

12.     At all times relevant hereto Company operated its business under a valid United States Department of Agriculture ("*USDA*") issued PACA License, which the USDA has identified as License No.: 20040551.

13.     At all times relevant hereto, Company acted or failed to act by and through its Principals.

14.     As a PACA licensee and dealer or broker of Produce, the acts, omissions, or failures of its Principals, employees, or agents constitute acts, omissions, or failures of Company.

15.     Although Company renewed its PACA License through March 15, 2016, on information and belief, Company voluntarily surrendered or otherwise caused the USDA to terminate its PACA License in October or November of 2015.

## JURISDICTION AND VENUE

16.     The District Court has subject matter jurisdiction over this civil action arising under § 499e(b)(2) and pursuant to 28 U.S.C. § 1331.

17.     The District Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1337 because PACA qualifies as an "Act of Congress regulating commerce" and several of Plaintiff's claims herein arise under 7 U.S.C. § 499e(b)(2), 7 U.S.C. § 499p, and 7 C.F.R. § 46 *et seq*.

18.     The District Court also possesses subject matter jurisdiction over this civil action under 28 U.S.C. § 1332 because there exists complete diversity of citizenship between the parties and the matter in controversy exceeds $75,000.00, exclusive of any claims for the recovery of exemplary damages, pre or post judgment interest, costs, or reasonable attorneys' fees.

19.     The Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. § 1367(a).

20.     The Court has *in rem* jurisdiction over the Plaintiff's claims pursuant to, *inter alia*, 28 U.S.C. § 1655.

21.     The District Court has personal jurisdiction over Xela, and any of the other Principals not residing within the State of Florida, pursuant to F.S. 48.193(1)(a)-(b) and F.S. 48.193(2).

22.     Venue in this district is based on 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district and a substantial part of the property that is the subject of this action is or was situated within this district.

23.     Venue in this district is further appropriate because the parties' Marketing Agreement states that the agreement shall be interpreted and governed by the laws of the State of Florida.

<u>FACTUAL ALLEGATIONS</u>

**Gutierrez Family Business**

24.     Upon information and belief, Xela, Tropic, Agro Mundial and Fresh Quest are just a portion of the Gutierrez Family Business ("Family Business" or "Family Businesses"). Upon information and belief, Xela is a holding company for a number of corporations located around the world.  Arturo is the patriarch of the Gutierrez family.

25.     Due to failing health and business acumen, Arturo largely ceded management of the Family Business to Juan, his eldest son.  Upon information and belief, Juan effectively exercises dominion and control over all of the Family Businesses, including Xela, Agro Mundial, Tropic and Fresh Quest.

26.     In 1982, Arturo decided to relocate from Guatemala to Toronto, Canada.  Shortly thereafter his daughter, Margarita Castillo ("Margarita") and his son, Juan and their families also moved to Toronto.

27.     Upon information and belief, Tropic was a company that was started by Ricardo Castillo, Margarita's husband ("Ricardo"), Margarita and another person in 1989.  Initially, this was a business entirely separate from Xela.

28.     Upon information and belief, Tropic is a holding company, which at some point in the past held all the shares in Fresh Quest.

29.     Upon information and belief, at some point in the 1990s, Ricardo acquired the third person's interest in Tropic. In or about 1994, Arturo asked Ricardo to use Tropic to hold the

interests in a predecessor company to Fresh Quest, known as Northern Produce Inc., which was primarily importing melons into North America from Central America. Tropic was selected to hold these interests because it was incorporated to operate an "agricultural" type of business.

30. Upon information and belief, shortly thereafter, Ricardo offered Juan and Arturo directorships of and shares in Tropic and they formally became shareholders on October 17, 1994 and directors on January 5, 1995; however, neither Arturo nor Juan paid anything for their Tropic shares.

31. As a result, the shares of Tropic were split 44.44% (Ricardo), 44.44% (Juan) and 11.11 % (Arturo).

32. On July 31, 2003, Northern Produce Inc. changed its name to Fresh Quest.

33. Upon information and belief, in April 2008, after leaving the Family Business, Ricardo transferred all of his 44% interest in Tropic to Margarita.

34. Up until late 2010, Tropic shares were directly owned by Margarita (44.44%), Juan (44.44%) and Arturo (11.11%). However, upon information and belief, in late 2010, Juan and Arturo sold their Tropic shares to Xela, making Xela the majority owner of Tropic.

35. Upon information and belief, despite Tropic's and Fresh Quest's purported separate legal identity, Juan, Arturo and Xela have historically treated Tropic and Fresh Quest like any other Xela subsidiary..

36. Upon information and belief, Arturo and Juan managed the day to day business of Fresh Quest, for which Xela charged Fresh Quest $80,000 per month and a sales commission on Canadian sales made by Fresh Quest fixed at US$12,500 per month.

37.     Upon information and belief, Juan and Arturo treat, and have treated, any money flowing into Fresh Quest as being "Xela's money".

38.     Upon information and belief, Juan and Arturo have operated Fresh Quest in a manner by, among other things: using Fresh Quest profits and resources to support Juan's personal political aspirations[3] and transferring Fresh Quest profits at any given time to other Xela companies that require money.

39.     Upon information and belief, none of the companies comprising the Family Business have been operated as separate legal entities.  Instead, they have been operated as a single enterprise and, in fact, Xela has been the alter ego of each such company, including Tropic and Company.

**<u>Record Keeping Duties & Requirements</u>**

40.     As a PACA licensee and dealer or broker of Produce, Company possesses a duty to keep such accounts, records, and memoranda and fully and correctly disclose all transactions involved in his business, including the true ownership of such business by stockholding or otherwise.[4]

41.     As a PACA licensee and dealer or broker of Produce, Company possesses a duty to prepare and preserve for a period of two years from the closing date of the transaction the accounts, records, and memoranda required by [PACA], which shall fully and correctly disclose all transactions involved in [its] business.[5]

---

[3] Juan ran for President of Guatemala in 2012 and 2015.
[4] 7 U.S.C. § 499i
[5] 7 C.F.R. § 46.14

42.     As a PACA licensee and dealer or broker of Produce, Company possesses a duty to ensure that their business records fully disclose all transactions in the business in sufficient detail as to be readily understood and audited.[6]

43.     As a PACA licensee and dealer or broker of Produce, Company possesses a duty to maintain records which will disclose all essential facts regarding the transactions in [its] business.[7]

44.     As a PACA licensee and dealer or broker of Produce, Company possesses a duty to ensure their business records include the corporate charter, record of stock subscription and stock issued, the amount paid in stock and minutes of stockholders' and directors' meetings showing the election of directors and officers, resignations and other pertinent corporate actions.[8]

45.     As a PACA licensee and dealer or broker of Produce, Company possesses an duty to preserve:

> [b]ills of lading, diversion orders, paid freight and other bills, car manifests, express receipts, confirmations and memorandums of sales, letter and wire correspondence, inspection certificates, invoices on purchases, receiving records, sales tickets, copies of statements (bills) of sales to customers, accounts of sales, papers relating to loss and damage claims against carriers, records as to reconditioning, shrinkage and dumping, daily inventories by lots, a consolidated record of all rebates and allowances made or received in connection with shipments handled for the account of another, an itemized daily record of cash receipts, ledger records in which purchases and sales can be verified, and all other pertinent papers relating to the shipment, handling, delivery, and sale of each lot of produce shall be preserved for a period of 2 years.[9]

46.     As a PACA licensee and dealer or broker of Produce, Company possesses a duty, in the event of any necessary allowance or adjustment being made to the buyers of Produce, to prepare a credit memorandum showing the buyer's name, sales ticket number, lot number, date

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] 7 C.F.R. § 46.15

of the granting of the allowance, and the amount of the credit or adjustment, with reasons therefor.[10]

47.     As a PACA licensee and dealer or broker of Produce, Company possesses a duty to maintain [a] clear and complete record showing justification for dumping of Produce if any portion of such Produce regardless of percentage cannot be sold due to poor condition or is lost through resorting or reconditioning.[11]

48.     As a PACA licensee and dealer or broker of Produce, Company possesses a duty, whenever five percent or more of a Produce shipment is dumped, to obtain an official certificate, or other adequate evidence, to prove the subject Produce was actually without commercial value, unless there is a specific agreement to the contrary between the parties.[12]

49.     As a PACA licensee and dealer or broker of Produce, Company possesses a duty to disclose in writing the existence of any collateral fees and expenses to all other parties to the transaction where the collateral fees and expenses affect a material term of the agreement.[13]

50.     As a shipper of Produce, Company possesses a duty to prepare and maintain records which fully and correctly disclose the details of its transactions.[14]

51.     As a shipper of Produce, Company possesses a duty to prepare and maintain a record of all produce handled, including its own production.[15]

52.     As a shipper of Produce, Company possesses a duty to maintain receiving records that show for each lot the date received, whether purchased or received on joint account, the

---

[10] 7 C.F.R. § 46.21
[11] 7 C.F.R. § 46.22
[12] *Id.* and 7 C.F.R. § 46.23
[13] 7 C.F.R. § 46.2(hh)
[14] 7 C.F.R. § 46.31(a)
[15] 7 C.F.R. § 46.31(b)

quantity, quality, and kind of produce, the purchase price or joint account cost, and the name and address of the supplier.[16]

53.     As a shipper of Produce, Company possesses a duty, when it purchased Produce from a grower, such as Plaintiff herein, to prepare and maintain records that show the disposition of the produce, whether sold or consigned, date of shipment, car-number, or if shipped by truck, the license number, name and address of the carrier, name and address of the buyer […] and other pertinent details of the transaction, such as the terms of sale, selling price, and date of payment.[17]

54.     As the alter egos of the Company, Xela, Juan and/or Arturo also had the duties and responsibilities set forth in the preceding paragraphs.

55.     As persons listed on the PACA license or in control of Company, Xela, Juan, Arturo, Tropic, Bofill, Korol, Guttmann and Shields also had the duties and responsibilities set forth in the preceding paragraphs.

**Produce Marketing & Distribution Agreement**

56.     On or about August 15, 2013, Plaintiff and Company entered into an exclusive marketing agreement, under which the Plaintiff agreed to sell the Produce and Company agreed to purchase the Produce for a period of three years, "encompassing the 2013-2014, 2014-2015, and 2015-2016 growing seasons between November and May of each year" (the "*Agreement*")[18].

57.     On or about September 16, 2014, Plaintiff executed Addendum I to the Agreement, which set forth additional terms relating to the parties' performance under the

---

[16] *Id.*
[17] 7 C.F.R. § 46.31(c)
[18]   Upon information and belief, during the time Plaintiff was shipping Produce to the Company, it's shipments represented more than 30% and likely 40% of the Company's melon business.

Agreement during the 2014-2015 growing season (hereinafter the "*Addendum*") (Agreement and Addendum hereinafter collectively the "*Marketing Agreement*", attached hereto as Exhibit 1).

58.     By executing the Marketing Agreement, Defendants expressly agreed that Plaintiff maintains all PACA rights.

59.     The Produce identified in the Marketing Agreement consisted of cantaloupe and Honey Dew melons, both of which are commodities the USDA expressly recognize as subject to the provisions of PACA.

60.     Company prepared or otherwise drafted the Marketing Agreement.

61.     The Marketing Agreement does not disclaim the use or otherwise prohibit the court's application of the rule of contra proferentum.[19]

62.     Pursuant to the Marketing Agreement, Plaintiff sold to Company, and Company purchased from Plaintiff, in excess of 18,700 pallets with more than 1.3 million cases of Produce during the 2014-2015 growing season[20].

63.     Company purchased from Plaintiff, and Plaintiff sold to Company, Produce in Company's name and for Company to resale to its customers under Company's name, brand, or label.

64.     Pursuant to the Marketing Agreement, Company assumed full responsibility for billings on all Produce Company purchased from Plaintiff and resold to its customers.

65.     The Marketing Agreement authorized Company to make all collections and receive all payments as a result of the products sold.

---

[19] "Contra proferentum," as used herein, shall have meaning set forth in the Restatement (Second) of Contracts § 206 (1981); *See generally Arriaga v. Florida Pacific Farms LLC*, 305 F.3d 1228 (11th Cir. 2002).
[20] Under the Marketing Agreement, Plaintiff sold over 1,000,000 cartons of Produce to the Company during the 2013-14 growing season and would have sold over 1,500,000 cartons of Produce during the 2015-16 season if Company had not breached the Marketing Agreement and committed the other tortious acts as set forth herein.

66.     The Marketing Agreement authorized Company to take in its own name, all measures that in its opinion may be necessary in order to obtain payments.

67.     Plaintiff and Company agreed that Company was responsible for the collection of the proceeds resulted from Company's Produce sales.

68.     Plaintiff and Company agreed that if either party brought an action against the other party under the Marketing Agreement, the prevailing party in such action shall be entitled to a judgment for reasonable attorneys' fees and costs, to be established by the court, including without limitation, costs of collection for any judgment issued by the court.

69.     Plaintiff did not consign Produce to Defendants.

70.     Company did not sell Plaintiff's Produce to its customers on a joint account with Plaintiff.

71.     Company did not sell Plaintiff's Produce to its customers as an agent for Plaintiff.

72.     Plaintiff and Company agreed that both parties are engaging their corresponding business separately and independently, and that the Marketing Agreement did not create or constitute a partnership, joint venture, or collective enterprise between them.

73.     In addition to the sale of Produce, the Marketing Agreement set forth additional terms by which Company would obtain transportation for Plaintiff's Produce and at Plaintiff's expense.

74.     The Marketing Agreement created two separate and distinct relationships between Company and Plaintiff.

75.     On one hand, the Marketing Agreement set forth the terms upon which Company purchased from Plaintiff, and Plaintiff sold Produce to Company.

76.     On the other hand, the Marketing Agreement set forth the terms upon which Company agreed to initially procure, secure, schedule, and provide certain freight and transportation related services to Plaintiff and Plaintiff agreed to pay for these ancillary services as expenses contemplated by the parties' pre-transaction written agreements to be deducted from Company's final liquidations to Plaintiff.

77.     As contemplated expenses, Company's ancillary transportation or freight related services were not capable of being quantified at the time Plaintiff and Company entered into the Marketing Agreement because performance has yet to begin by either party.

78.     Pursuant to the Marketing Agreement, Plaintiff sold to Company, and Company purchased from Plaintiff, Produce in ton-lot (i.e., 2,000 pounds) quantities in that each shipment of Produce totaled or exceeded 2,000 pounds in weight.

79.     Company imported and subsequently received Plaintiff's Produce at, *inter alia*, the following U.S. Ports: (i) Port Manatee in Tampa, Florida; (ii) Port of Miami, in Miami, Florida; (iii) Port Everglade in Fort Lauderdale, Florida; (iv) Port of Los Angeles in Los Angeles, California, and; (v) Port of Philadelphia in Philadelphia, Pennsylvania.

80.     Company received and accepted Plaintiff's Produce in foreign commerce.

## Accounting Duties & Requirements

81.     Pursuant to the Marketing Agreement, Plaintiff and Company agreed that the parties will disclose in the course of doing business certain confidential and proprietary information to each other.

82.     The Marketing Agreement defined "confidential information" to "mean all information related to [Plaintiff's] and [Company's] business concepts and strategies, it includes customer and supplier information, products, technology, specifications, manuals, business

plans, marketing plans, selling prices, expansion and production plans, government contracts, know-how, financial information,, contracts with banks and other banking information, and other information disclosed or submitted orally, in writing or by any other form."

83.     The Marketing Agreement contemplated and provided for the free of exchange of Confidential Information between Company and Plaintiff.

84.     Pursuant to the Marketing Agreement, Company agreed that it shall account to Plaintiff for each shipment received and provide timely liquidations in accordance with the provisions in paragraph / section 6.

85.     Pursuant to the Marketing Agreement, Company agreed that its final liquidation would contain detail regarding the proceeds of Company's sale of Plaintiff's Produce and agreed upon import costs.

86.     Pursuant to the Marketing Agreement, Company possesses a duty to provide Plaintiff two (2) weekly price reports: Report 1) Detailing product sold and Report 2) Forward looking market analysis.

87.     Pursuant to the Marketing Agreement, the Report 1 accounting must include details about the product sold, pricing, expected deductions for freight, advances, boxes, materials, warehousing, insurance, false freight, etc. and was to be itemized by pallet tag number.

88.     The Marketing Agreement obligated Company to provide Plaintiff with the Report 1 accounting 12 days after the product's arrival[21] in North America.

89.     Pursuant to the Marketing Agreement, the sales detail for product sold shall already take any actual sales adjustments, allowances, delivery freight, temperature records, and other fee pertaining to the sale/shipping of Plaintiff's product into consideration.

---

[21] "Product arrival," as used herein, means the date Plaintiff's Produce arrived at any U.S. Port of entry.

90.     The Marketing Agreement stated that Company's sale of Plaintiff's Produce that did not meet the quality standards established in the Marketing Agreement will not be priced in the Report 1 accounting but would otherwise be reported to Plaintiff within the 12 day timeline.

91.     In the Marketing Agreement, Company agreed to provide Plaintiff with accurate accounts of its Produce.

92.     As a PACA licensee and dealer or broker of Produce, Company possessed a duty to account promptly to Plaintiff as set forth in the Marketing Agreement.

93.     As a PACA licensee and dealer or broker of Produce, Company possessed a duty to ensure its accounts to Plaintiff were true and correct.

94.     As a PACA licensee and dealer or broker of Produce, Company possessed a duty to deal fairly with Plaintiff and in good faith.[22]

95.     As a PACA licensee and dealer or broker of Produce, Company possessed a duty to disclose in writing the existence of any collateral fees and expenses[23] where the collateral fees and expenses affect a material term of the agreement.[24]

96.     Pursuant to section 7 of the Addendum, Company agreed to "provide [Plaintiff] with documentation to substantiate the deduction for packaging materials itemized on each liquidation."

97.     Pursuant to section 17 of the Addendum, Company's "Report 1 will include an estimate of all charges that are expected to be deducted from the final liquidation including, but

---

[22] "Good faith," as used herein, means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.  7 C.F.R. § 46.2(hh).
[23] "Collateral fees and expenses," as used herein, means "any promotional allowances, rebates, service or materials fees paid or provided, directly or indirectly, in connection with the distribution of marketing of any perishable agricultural commodity.  7 U.S.C. § 499a(13).
[24] 7 C.F.R. § 46.2(hh).

not limited to freight, advance deductions, boxes and materials, warehousing, insurance, false freight, etc."

98.     Pursuant to the Marketing Agreement, Company agreed to make every effort to inform Plaintiff of discrepancies in reported expenses as soon as possible.

**Payment Terms**

99.     Pursuant to the Marketing Agreement, Company agreed to remit payment to Plaintiff within 45 days of the product's arrival to Company.

100.    Pursuant to the Marketing Agreement, Company agreed that final liquidations on each shipment of Produce from Plaintiff to Company were due 45 days after the product's arrival date.

**Price Terms**

101.    Pursuant to the Marketing Agreement, for product meeting the quality standards detailed in Marketing Agreement, Company agreed that its weekly gross FOB sales price must, at a minimum, reflect the Monday - Friday average "low" of the USDA Market News report allowing for a 10% negative variation.

102.    The Addendum clarified the Marketing Agreement and stated that the USDA benchmark as per numeral 4.f. of the original Agreement will apply to 100% of the volume shipped to Port Manatee and California.

103.    The Addendum further clarified that USDA shipping point prices will be used for each specific location when available.

104.    Company and Plaintiff agreed that the USDA Market News Report's Monday – Friday average low price, less a 10% negative variation, would serve as a minimum sales price

for all of Plaintiff's Produce that satisfied the quality standards set forth in the Marketing Agreement.

105.    Pursuant to the Marketing Agreement, if Company's sales performance fell below the agreed upon USDA benchmark, Company would be obligated to make a contribution or catch-up payment to Plaintiff upon final liquidation in an amount equal to the shortfall, if any.

106.    For purposes of establishing a minimum FOB sales price, Plaintiff and Company agreed that Plaintiff's Produce had to meet U.S. No. 1 standards upon arrival at any North American port of entry and to the Company's customer if Company delivered said Produce to its customer within 10 days of the product's arrival date.

107.    For purposes of establishing a minimum FOB sales price, Plaintiff and Company agreed that Plaintiff's Produce had to meet U.S. No. 1 standards upon arrival at any North American port of entry and to the Company's customer in order to ensure the Produce's quality (i.e., U.S. No. 1) upon its arrival date was aligned with the relevant USDA Market News Report the parties agreed to use as a benchmark during the period of time when Company actually sold Plaintiff's Produce in North America.

108.    Pursuant to the Addendum, Company and Plaintiff agreed that any fixed price agreements that are agreed upon between the parties will be excluded from the USDA benchmark when it affects it negatively.

109.    Company did not submit any fixed price contacts or agreements with third parties to Plaintiff in order to for the parties to reach any agreement that Company's sales to such third party under a fixed price agreement be excluded from the USDA benchmark when it affects it negatively.

110.    Company disclosed to Plaintiff, via a marketing and distribution update, certain customer specific promotional contracts that identified weekly volume, size, and price point data to serve as a weekly sales performance benchmark for the season.

111.    Company's sale of every shipment of Plaintiff's Produce through week 18[25] of the 2014-2015 growing season was subject to the USDA benchmark identified in the Marketing Agreement.

112.    Pursuant to the Addendum, Company and Plaintiff agreed that any volume of Produce shipped after week 18 will not be subject to a USDA benchmark.

**Authorized Deductions & Limitations**

113.    Pursuant to the Marketing Agreement, Plaintiff agreed to allow Company to recover $1.00 per box pre-season advance and the $0.838 per box seed value advance from each box liquidated.

114.    During the 2014-2015 growing season, the Marketing Agreement authorized Company to deduct $1.00 per box of Plaintiff's Produce it sold to its customers until such time as Company repaid the bank for the $1,200,000.00 pre-season advance it paid to Plaintiff and both Company and Agro Mundial guaranteed. [26]

115.    In connection with Company's and Agro Mundial's agreement to guarantee the bank's $1.2 MM loan to Plaintiff, Company and Plaintiff agreed to share the related interest charges due to the bank on a 50/50 basis.

---

[25] The Marketing Agreement identified weeks as they appear on the calendar in that "Week 52" would be the last week of December in any given calendar year and "Week 1" would be the first week in January of any given calendar year.  So, "after week 18," as used in the Marketing Agreement and herein, means Produce with a product arrival date of on or after May 1, 2015.

[26] During the 2013-14 growing season, the Company advanced the $1.0 Million plus to Plaintiff to be used to acquire seeds and to cover other upfront costs.  Upon information and belief, Plaintiff now believes that the Company changed this arrangement to guaranteeing a loan due to its deteriorating financial condition.  Indeed, Plaintiff is aware that there has been substantial litigation between family members regarding the Family Business directly involving the Company and Tropic.

116.     Company's authority to deduct $1.00 per box of Plaintiff's produce ended or otherwise terminated once Company repaid the bank $1,200,000.00, plus Company's 50% share of the related interest payments due to the bank.

117.     The Marketing Agreement authorized Company to deduct $0.838 per box of Plaintiff's Produce it sold to its customers until such time as Company repaid itself for any pre-season seed value advance provided to Plaintiff.

118.     Company's authority to deduct $0.838 per box of Plaintiff's produce ended or otherwise terminated once Company repaid itself for any pre-season seed value advance provided to Plaintiff.

119.     In section 9 of the Addendum, Plaintiff agreed to pay $5,000.00 towards the cost of Company's third party liability and recall insurance policy covering Plaintiff's Produce.

120.     On at least one occasion, Plaintiff contended that product was damaged in transit to the vessel (evidenced by Fresh Quest's on-site personnel) and yet no claim was filed and no formal explanation has been given why there has been no action taken.

121.     Section 9 of the Addendum authorized the Company to deduct $0.005 (half of one cent) per box of Plaintiff's Produce it sold to its customers until such time as Plaintiff paid Company the agreed upon $5,000 contribution toward Company's third party liability and recall insurance policy covering Plaintiff's Produce.

122.     Company's authority to deduct $0.005 (half of one cent) per box of Plaintiff's produce ended or otherwise terminated once Company collected the agreed upon $5,000 contribution toward Company's third party liability and recall insurance policy covering Plaintiff's Produce.

123.     The Marketing Agreement authorized Company to make sales adjustments and actual allowances that, in good faith, are justifiable or necessary.

124.     As an agreed limitation upon Company's authority to make justifiable or necessary sales adjustments and allowances, the parties agreed that all adjustments shall be made within 12 days of product arrival at any North American port of entry.

125.     Pursuant to the Marketing Agreement, Plaintiff authorized Company to charge its customers for delivery freight, temperature recorders and any other fees pertaining to the sale/shipping of Plaintiff's Produce and to deduct any such expenses including but not limited customer rebates and promotional allowances, from Company's gross FOB sales proceeds.

126.     Pursuant to the Marketing Agreement, Plaintiff authorized Company to utilize a scaled commission schedule to calculate commission charges for product satisfying U.S. No. 1 quality standards.

127.     Pursuant to the Marketing Agreement, Plaintiff authorized Company to change Plaintiff a flat 5% commission rate for Company's sale of Plaintiff's Produce not satisfying U.S. No. 1 quality standards.

128.     For purposes of calculating commissions, Plaintiff's obligation to tender Company U.S. No 1 quality Produce was not on an ex works basis,[27] but rather Plaintiff's obligation was extended to North American and then, as long as Company delivered Plaintiff's Produce to said customer within 10 days of the Produce's arrival date, on to Company's customer location.

---

[27] Plaintiff's obligation to tender U.S. No. 1 Produce to Company on a "ex works" basis was solely for purposes of calculating the minimum price guarantee.

129.   Pursuant to the Marketing Agreement, Plaintiff agreed to pay Company a $190.00/pallet all-inclusive door to door supply chain rate for shipping charges from Plaintiff's farm/pack house in Guatemala to the U.S. port of entry.

130.   Pursuant to the Marketing Agreement, Company agreed to schedule in-land transportation from Plaintiff's farm/pack house in Guatemala to the Guatemala port where Company's vessel was scheduled to depart.

131.   Plaintiff agreed to permit Company to charge and otherwise assess a false freight penalty of $100.00 per pallet for each pallet below the shipping volumes identified in Attachment A, less a 10% negative variance.

132.   Plaintiff agreed to permit Company to deduct any false freight penalty charges from final liquidations.

133.   Pursuant to the Marketing Agreement, Company was not authorized to assess or otherwise charge Plaintiff any false freight penalty charges for pallets not delivered on time to the vessel for in-land transportation delays or failures.

134.   Pursuant to the Addendum, Plaintiff authorized Company to charge a flat 5% commission rate on any Honeydews, Personal Watermelons and Galia melon from production trials Plaintiff raised for and shipped to Company.

135.   Pursuant to the Addendum, Plaintiff authorized Company to charge it for any re-palletizing charges arising from any use by Plaintiff of a non-conforming pallet, if any.

136.   Pursuant to section 7 of the Addendum, Plaintiff agreed to negotiate box prices directly with the box company, and will place a Purchase Order with them every week for the quantity of boxes that Plaintiff projects will be required for the delivery of contracted Produce to

Company; provided however, the box company would verify and approve the weekly purchase order with both Company and Agro Mundial prior to delivery of said boxes.

137.     Pursuant to section 7 of the Addendum, Company agreed to be responsible for the corresponding payment to CYBSA matching each Purchase Order and, in exchange for this promise, Plaintiff authorized Company to deduct those costs from the amounts Company owes Plaintiff for its sale of Plaintiff's Produce.

138.     Pursuant to section 7 of the Addendum, Plaintiff authorized Company to deduct or otherwise withhold from deductions any amounts necessary to pay CYBSA for unpaid past due invoices to Plaintiff.

**Minimum Price Guarantee**

139.     Pursuant to the terms of the Marketing Agreement, Company agreed to guarantee a $3.50 /box ex-works minimum liquidation for product meeting U.S. No. 1 quality specifications.  For product meeting U.S. No. 1 quality specifications, the minimum guarantee is net of the pre-season advance and the value of the seed being provided to Plaintiff by Company.

140.     Ex Works is an international trade term that describes an agreement in which the seller is required to make goods ready for pick-up at his own place of business with all other transportation and costs and risks are assumed by the buyer.

141.     Based upon the Company's agreement to provide a minimum price guarantee on an "ex works" basis, Plaintiff was required to make its Produce ready for Company to pick-up at its farm or place of business (i.e., packing house or cold storage located in Guatemala) and said Produce was required to meet U.S. No. 1 quality specifications at the time Company picked-up Produce from Plaintiff in Guatemala.

142.    Pursuant to the terms of the Agreement, Plaintiff was obligated to provide to Company product in a condition and quality that is in accordance with the prevailing U.S. No. 1 standards.

143.    Attachment B to the Agreement sets forth the agreed upon quality standards for the Produce Company purchased from Plaintiff.

144.    Attachment B to the Agreement requires Plaintiff's Produce to meet U.S. No. 1[28] standard for fresh Cantaloupe melons.

145.    Because Plaintiff agreed with the terms of Attachment B, which requires Plaintiff to ensure that its Produce meets U.S. No. 1 standards upon arrival at any North American port of entry and to the Company's customer if the Produce is delivered to said customer within 10 days of the product's arrival date, Company agreed that, for purposes of calculating the minimum price guarantee, Plaintiff need only tender Produce satisfying U.S. No. 1 standards on a "ex works" basis.

146.    The minimum price guarantee is net of the pre-season advance and the value of the seed being providing to Plaintiff by Company.

147.    Company agreed to pay and otherwise guaranteed to pay Plaintiff, *inter alia*, $3.50 per carton for all Product that met the U.S. No. 1 standard on an ex works basis upon Company's acceptance of Plaintiff's Produce in Guatemala.

148.    Company ensured Plaintiff's Produce met the U.S. No. 1 standard on an ex works basis by, *inter alia*, assigned Company employees or contractors to monitor Plaintiff's packing and loading operations and a second employee or contractor to gather and provide quality control information to Company.

---

[28] The term "U.S. No. 1," as used herein, carries the same meaning as set forth in 7 C.F.R. § 51.476, including its tolerance provisions.

149.    Company utilized Agro Mundial personnel and equipment (e.g., printer, computer, and software) to monitor Plaintiff's packing and loading operations and to gather and provide quality control information to Company.

150.    The "ex works" nature of the minimum price guarantee was reaffirmed in section 11 of the Addendum.

151.    Pursuant to the Addendum, the totality of the volume for the [2014-2015] season will be subject to the Minimum Guarantee clause as per section 4.a. of the original Agreement.

**CYBSA Packaging Materials Financing**

152.    Pursuant to Section 7 of the Addendum, Plaintiff agreed to negotiate box prices directly with the box company CYBSA and to place a Purchase Order with them every week for the quantity of boxes that Plaintiff projects will be required for the delivery of contracted Produce to Company.

153.    Plaintiff secured 60 day credit terms from CYBSA for packaging materials delivered to Plaintiff for the delivery of contracted Produce to Company.

154.    Pursuant to Section 7 of the Addendum, Company agreed that it will guarantee payment of CYBSA's invoices to Plaintiff for packaging materials Plaintiff used to pack Produce shipped to Company if said invoices remained unpaid for more than sixty (60) days and would deduct such funds from any amounts due and owing from Company to Plaintiff.

**Shipping Terms & Produce Delivery Time Frame**

155.    Pursuant to the Agreement, Company shall have 10 days from the date the product arrives to any U.S. port of entry to deliver Plaintiff's product to Company's customer.

156.    Pursuant to the Agreement, Company utilized its break bulk vessel to transport Plaintiff's Produce from Guatemala to North America.

157.   Plaintiff and Company agreed that the vessel and distribution is Company's private charter.

158.   Company agreed to provide Plaintiff space on its break bulk vessel charter and other commercial shipping lines, and Plaintiff agreed to provide Company with set volumes of Produce to ship, on a weekly basis and pursuant to a weekly schedule attached to the Marketing Agreement.

159.   The Marketing Agreement provided Plaintiff with a 10% negative variance from the agreed upon volume to be shipped each week.

160.   Pursuant to the Marketing Agreement, Company was responsible for locating, contracting, and scheduling the transportation, both in-land and over seas, of all the Produce it purchased from Plaintiff.

161.   Pursuant to the Marketing Agreement, Company's obligation to procure transportation for Plaintiff's Produce originated upon Company's pick-up of said Produce at Plaintiff's farm or packing house in Guatemala.

162.   Pursuant to the Marketing Agreement, Company's obligation to procure transportation for Plaintiff's Produce terminated upon Company's delivery of said Produce to its customers in North America.

163.   Company contracted with various in-land and overseas carriers in both Guatemala and North America to arrange for the transportation of Plaintiff's Produce from the farm in Guatemala to its customers in North America.

164.   Company received and paid various in-land and overseas carriers in both Guatemala and North America for freight and transportation services related to its agreement to procure such services for or on behalf of Plaintiff.

165.    Pursuant to the Marketing Agreement, Plaintiff authorized Company to deduct all actual freight charges, freight related penalties, transportation costs, temperature recorder costs, and other related shipping charges from any monies due to Plaintiff.

166.    Pursuant to the Marketing Agreement, Plaintiff was obligated to pay for or otherwise reimburse Company for all actual costs of transportation related to Company's purchase and resale of Plaintiff's Produce.

**Quality Control & Documenting Quality Problems**

167.    Pursuant to the Marketing Agreement, Company agreed that if quality problems arise, Company would document said problem and obtain a U.S.D.A. inspection when possible.

168.    The Marketing Agreement required Company to obtain a USDA inspection to prove Plaintiff's Produce failed to meet U.S. No. 1 quality standards.

169.    Nothing in the Marketing Agreement constituted a waiver of Plaintiff's right to require Company to obtain a timely USDA inspection to prove or otherwise support a claim that any of Plaintiff's Produce failed to meet the quality standards set forth in Attachment B and to communicate any such claim and supporting documents to Plaintiff.

170.    Pursuant to the Marketing Agreement, Plaintiff agreed that its Produce must meet U.S. No. 1 quality and condition standards upon arrival to any North American port of entry and, if the Produce was delivered to Company's customer within 10 days of the product's arrival date, to the location of Company's customer.

171.    Pursuant to the Agreement, Plaintiff would not be held accountable for quality claims for product delivered outside the 10 day timeline.

172.    Pursuant to the Agreement, Plaintiff agreed to allow Company the right to maintain a full-time employee at Plaintiff's packing plant to ensure that all pallets are properly

tagged and shipped on a timely basis and another full-time employee to gather quality control information.

173.    Company personnel or representatives were present at Plaintiff's Guatemalan packing plant and supervised Plaintiff's packing of all Produce Company purchased from Plaintiff.

174.    Company personnel or representatives were present at Plaintiff's Guatemalan packing plant and gathered quality control information regarding the Produce Company purchased from Plaintiff.

175.    Company personnel or representatives ensured Plaintiff's Produce satisfied or otherwise met U.S. No. 1 standards on an ex works basis prior to Company's loading of Plaintiff's Produce onto in-land trucks in Guatemala and subsequently on its chartered vessel for delivery to North America.

176.    As the alter egos of the Company, Xela, Juan and/or Arturo also had the duties and responsibilities set forth in the preceding paragraphs.

177.    As persons listed on the PACA license or in control of Company, Xela, Juan, Arturo, Tropic, Bofill, Korol, Guttmann and Shields also had the duties and responsibilities set forth in the preceding paragraphs.

## COUNT I

### <u>PACA Violation (Unfair Trade Practice): Failure to Account Promptly</u>
**7 U.S.C. 499b(4)**
**DEFENDANTS**

178.    Plaintiff re-alleges paragraphs 1 through 177 as though fully set forth herein.

179.    Defendants picked-up and otherwise accepted Plaintiff's tender or delivery of the Produce identified in the Marketing Agreement at Plaintiff's farm or packing house in Guatemala.

180.    Defendants imported and otherwise received the Produce identified in the Marketing Agreement at various ports in North America.

181.    As a PACA licensee and dealer or broker of Produce, Defendants possessed a statutory duty to account promptly to Plaintiff for any and all Produce transactions between the parties.

182.    PACA and its regulations authorize parties to Produce transactions to utilize pre-transaction written agreements to establish timelines governing the Produce buyer's accounting obligations.

183.    The Marketing Agreement set forth the agreed upon times and reporting intervals for Defendants to account to or otherwise provide Plaintiff with true and correct accountings of the parties' Produce related transactions.

184.    The Marketing Agreement obligated Defendants to provide Plaintiff with its "Report 1" accounting thirteen (13) days after a given shipment of Plaintiff's Produce arrived at its U.S. Port of entry.

185.    Defendants routinely (i.e., on more than 52% of its Produce transactions with Plaintiff) failed to provide Plaintiff with the Report 1 accounting within the time frame set forth in the Marketing Agreement.

186.    On multiple Produce shipments, Defendants wholly failed to provide Plaintiff with a Report 1 accounting.

187.    The Marketing Agreement obligated Defendants to provide Plaintiff with a "Final Liquidation" report or accounting seven (7) days prior to the forty-five (45) day final payment due date.

188.     Defendants routinely failed to provide Plaintiff with the Final Liquidation report or accounting within the time frame set forth in the Marketing Agreement.

189.     On multiple Produce shipments, Defendants wholly failed to provide Plaintiff with a Final Liquidation report or accounting.

190.     Throughout the season, Plaintiff requested repeatedly and was denied access to the sales information as required by the Marketing Agreement and PACA.

191.     The matters and actions alleged in this Count I constitute a violation by Defendants of Section 2 of the PACA.

192.     As a direct result of Defendants' failure to account to Plaintiff within terms, the Plaintiff has incurred damages in an amount to be proven at trial, plus interest and all costs of collection, including attorneys' fees.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)     Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)     Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT II

### PACA Violation (Unfair Trade Practice): Failure to Promptly Pay
### 7 U.S.C. 499b(4)
### DEFENDANTS

193.     Plaintiff re-alleges paragraphs 1 through 192 as though fully set forth herein.

194.     As a PACA licensee and dealer or broker of Produce, Defendants possessed a statutory duty to promptly pay Plaintiff for any and all Produce transactions between the parties.

195.    Plaintiff and Defendants entered into a series of transactions involving Plaintiff's sale and Company's purchase of Produce between November of 2014 and June of 2015 (the "*Growing Season*").

196.    The Marketing Agreement governed the Produce transactions between Plaintiff and Defendants.

197.    Throughout the Growing Season, Defendants imported and received from Plaintiff not less than 55 shipments (i.e., vessel loads) of Produce consisting of not less than 18,700 pallets containing more than 1.3 million cases of Produce.

198.    Pursuant to the Marketing Agreements, Defendants were obligated to pay Plaintiff for all Produce transactions "within 45 days of the product's arrival" to Company in North America.

199.    Throughout the Growing Season, Defendants routinely failed to pay Plaintiff within the applicable payment terms that were in effect between the parties at the time of each transaction.

200.    On week 18, Defendants picked-up and accepted Produce from Plaintiff and wholly failed to pay Plaintiff for the subject Produce, which amount exceeds $200,000.00.

201.    The matters and actions or inactions alleged in this Count II constitute violations by Defendants of Section 2 of the PACA.

202.    As a direct result of Defendants' failure to account to Plaintiff within terms, the Plaintiff has incurred damages in an amount to be proven at trial, plus interest and all costs of collection, including attorneys' fees.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)      Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)      Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

**COUNT III**

**<u>BREACH OF CONTRACT</u>**
**COMPANY**

203.    Plaintiff re-alleges paragraphs 1 through 202 as though fully set forth herein.

204.    In the Marketing Agreement, Plaintiff agreed to sell Produce to the Company and Company agreed, *inter alia*, to purchase Produce from the Plaintiff.

205.    In the Marketing Agreement, Company agreed to procure, schedule, and initially pay for the transportation (i.e., freight or shipping costs) of Plaintiff's Produce from Plaintiff's farm or packing house in Guatemala to Company's customer in North America with the understanding that any and all such costs or charges will be deducted from the gross proceeds of Company's sale of Plaintiff's Produce.

206.    Plaintiff delivered conforming goods to Company and has otherwise satisfied all conditions of said contracts.

207.    Company was obligated to obtain a timely USDA inspection to support any claim that Plaintiff's Produce failed to meet the U.S. No. 1 quality standard at destination.

208.    Company failed to obtain a timely USDA inspection to support any failure to pay Plaintiff.

209.    Plaintiff is an unpaid supplier of Produce having sold Produce to the Defendants for which it remains unpaid.

210.    Pursuant to the terms of the Marketing Agreement, Defendants withheld $235,469.15 of funds due and owing to Plaintiff specifically identified as funds withheld to pay CYBSA's invoices to Plaintiff for packaging materials Plaintiff used to pack Produce shipped to Company.

211.    Notwithstanding Defendants withholding of funds from Plaintiff to pay CYBSA's invoices to Plaintiff, Defendants failed to pay CYBSA's invoices for packaging materials Plaintiff used to pack Produce shipped to Company.

212.    Defendants' withholding of funds due and owing to Plaintiff for the express purpose of paying CYBSA's invoices to Plaintiff and Defendants subsequent failure to pay said invoices constitutes a breach of the Marketing Agreement.

213.    Prior to the filing of the above styled civil action and throughout the Growing Season, Plaintiff sent multiple writings to Company outlining its objections, grievances, and other problems with Company's performance under the Marketing Agreement.

214.    Prior to the filing of the above styled civil action and throughout the Growing Season, Plaintiff's executives met face-to-face with Guttmann and other Company executives to discuss its objections, grievances, and other problems with Company's performance under the Marketing Agreement in an effort to effectuate an amicable resolution to the same.

215.    Prior to the filing of the above styled civil action and throughout the Growing Season, Plaintiff sent multiple writings to Company demanding accountings and payment.

216.    Defendant's failure to account promptly to Plaintiff constitutes a breach of contract.

217.    Defendant's failure to promptly pay Plaintiff for its purchase of Plaintiff's Produce constitutes a breach of contract.

218.    Defendant's failure to obtain a timely USDA inspection to support the Company's failure or refusal to pay Plaintiff for its Produce constitutes a breach of contract.

219.    Defendant's failure to use the funds it withheld from monies due and owing to Plaintiff to pay the CYBSA's invoices to Plaintiff constitutes a breach of contract.

220.    As a direct result of Defendants' breaches of contract, Plaintiff has incurred damages in an amount to be proven at trial, plus interest and all costs of collection, including attorneys' fees.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)    Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)    Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

**COUNT IV**
**<u>BREACH OF FIDUCIARY DUTY</u>**
**PRINCIPALS**

221.    Plaintiff re-alleges paragraphs 1 through 220 as though fully set forth herein.

222.    At all times relevant to this action, the Principals were each officers, directors, members, or shareholders of the Company, and the persons in charge of its business undertakings.

223.    At all times relevant to this action, Principals controlled and managed Company's operations and had control over Company's financial dealings.

224.    At all times relevant to this action, Principals were each in a position to control and manage Company's operations and had the ability to control Company's financial dealings.

225.    At all times relevant to this action, Principals each had the authority to direct the payment of Company's operating funds and otherwise had the power to direct the application or disposition of its assets.

226.    At all times relevant to this action, Principals were in a position to influence Company's application of its operating funds and otherwise had the power to influence the application or disposition of its assets.

227.    Upon information and belief, at all times relevant to this action, Principals were authorized signatories on Company's bank account(s) and otherwise had the power to direct the application or disposition of its assets.

228.    As officers, directors, or shareholders of Company, Principals each possessed a statutory duty to ensure that Company performed all duties, express or implied, arising out of Company's undertakings in connection with Company's Produce transactions, which included, *inter alia*, ensuring Company's compliance with its obligations to Plaintiff under PACA.

229.    As officers, directors, or shareholders of Company, Principals were each in a position to exercise judgment, discretion or control over Company's operations and its financial dealings, which included, *inter alia*, ensuring that Company neither acted nor failed to act in any manner that could result in Company's violation of its obligations to Plaintiff under PACA.

230.    As officers, directors, or shareholders of Company, Principals each knew or should have known of Company's failure to promptly account to and pay Plaintiff for each shipment of Produce Company purchased pursuant to the terms of the Marketing Agreement.

231.    As officers, directors, or shareholders of Company, Principals each possessed the power necessary to counteract or obviate the decisions of Company, or other Principals, not to pay Plaintiff or not to properly account to Plaintiff.

232.    Because Principals controlled and/or were in a position to control Company, and the Plaintiff has not been paid pursuant to the terms of the Marketing Agreement, Principals have breached their fiduciary duties under PACA.

233.    Because each of the Principals were either in control or were in a position to control Company, and Principals failed to ensure that there were, at all times, sufficient assets available to satisfy all of Company's obligations to Plaintiff as an unpaid Produce supplier, Principals have each breached their fiduciary duties under PACA.

234.    Because each of the Principals were either in control or were in a position to control Company, and Principals failed to counteract or obviate the decisions of Company, or other Principals, not to pay Plaintiff, Principals have each breached their fiduciary duties under PACA.

235.    Principals are each personally liable to Plaintiff, which liability is joint and several with Company, for their respective breaches of fiduciary duties under PACA in an amount to be proven at trial, plus interest and all costs of collection, including attorneys' fees, to be satisfied from the Principals' personal assets.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)    Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)    Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

**COUNT V**

**PACA Violation (Unfair Trade Practice): Failure to Truly and Accurately Account**
**7 U.S.C. 499b(4)**

**DEFENDANTS**

236.    Plaintiff re-alleges paragraphs 1 through 235 as though fully set forth herein.

237.    Principals are the current or former officers, directors, members or shareholders of Company.

238.    At all times relevant to this action, Principals were either in control or in a position to control the assets of the Company.

239.    Company possessed an affirmative duty to truly and correctly account to Plaintiff with regard to any and all of the parties Produce related transactions.

240.    Throughout the Growing Season, Plaintiff complained, both orally and in writing, to Company about the inadequate or insufficient returns the Company was reporting in their Report 1 and Final Liquidation Reports.

241.    In connection with Plaintiff's complaints or objections to Company's sales performance, Plaintiff demanded additional information from the Company pertaining to its sale of Plaintiff's Produce and certain deductions from the reported sales proceeds.

242.    Despite Plaintiff's demands for additional information concerning its Produce transactions with Company, Defendants refused to account to Plaintiff.

243.    Despite demands from Plaintiff, Company refused to provide Plaintiff with the information necessary to determine the truth, accuracy, or validity of Company's reported sales performance and related deductions.

244.    Defendants' failure or refusal to provide Plaintiff with the information necessary to determine the truth, accuracy, or validity of Company's reported sales performance prevented

Plaintiff from being able to evaluate the Company's sales performance pursuant to the terms of the Marketing Agreement.

245.    Defendants' failure or refusal to provide Plaintiff with the information necessary to determine the truth, accuracy, or validity of Company's reported sales performance prevented Plaintiff from being able to evaluate the Company's sales performance utilizing the USDA Market News Report for the geographical region in which the Plaintiff's Produce was in fact sold (i.e., Company prevented Plaintiff from being able to identify where its Produce was being sold).

246.    Notwithstanding Plaintiff's obligation to deliver USDA No. 1 quality Produce to Company's customer's physical location, Company failed and otherwise refused to provide Plaintiff with information regarding the geographical location of its sales of Plaintiff's Produce.

247.    Defendants' failure or refusal to provide Plaintiff with the information necessary to determine the truth, accuracy, or validity of Company's reported deductions prevented Plaintiff from being able to evaluate the Company's deductions from reported amounts due to Plaintiff under the terms of the Marketing Agreement.

248.    Defendants' failure or refusal to provide Plaintiff with the information necessary to determine the truth, accuracy, or validity of Company's reported deductions prevented Plaintiff from being able to determine whether the Company's reported deductions: (i) were in fact incurred; (ii) represented actual charges passed through to Plaintiff; (iii) were marked-up by Company, or (iv) supported by proper documentation (e.g., third party invoices to Company, etc.).

249.    On information and belief, Defendants failed to truthfully or accurately report their actual gross sales price information to Plaintiff.

250.     On information and belief, Defendants failed to truthfully or accurately report their actual authorized deduction amounts to Plaintiff.

251.     On information and belief, Defendants overstated certain deductions and withheld improperly monies due and owing to Plaintiff under the Marketing Agreement.

252.     On information and belief, Defendants withheld unapproved or unauthorized deductions from monies due and owing to Plaintiff under the Marketing Agreement.

253.     On information and belief, Defendants understated their actual sales performance information to Plaintiff in order to improperly reduce the sums Company owed to Plaintiff under the Marketing Agreement.

254.     On information and belief, Defendants refused to disclose the geographic sales information to Plaintiff in order to either avoid the application of the relevant USDA Market News Report to Company's sales performance information or to benefit from the use of a USDA Market News Report from an area with lower reported sales data (e.g., Miami, FL instead of Bronx, New York).

255.     Defendants' failure or refusal to provide Plaintiff with true and correct accounting of its sales performance constitutes a violation by Defendants of Section 2 of the PACA.

256.     Defendants' failure or refusal to provide Plaintiff with true and correct information regarding its deductions under the Marketing Agreement constitutes a violation by Defendants of Section 2 of the PACA.

257.     On information and belief, Principals caused Company to commit a breach of the PACA by, *inter alia*, causing Company to refuse to provide Plaintiff with true and correct information.

258.    On information and belief, Principals caused Company to commit a breach of the PACA by, *inter alia*, causing Company to provide false or misleading information to Plaintiff for the purpose of reducing the amounts Company was obligated to pay Plaintiff under the Marketing Agreement.

259.    As a direct result of Defendants failure to provide Plaintiff with true and accurate accountings, Plaintiff has incurred damages in an amount to be proven at trial, plus interest and all costs of collection, including attorneys' fees.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)    Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)    Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT VI
## PACA Violation (Unfair Trade Practice): Make False or Misleading Statements
## DEFENDANTS

260.    Plaintiff re-alleges paragraphs 1 through 259 as though fully set forth herein.

261.    As a PACA licensee and dealer or broker of Produce, Defendants possessed a statutory duty not to make, for a fraudulent purpose, any false or misleading statement to Plaintiff in connection with any and all Produce transactions between the parties.

262.    Company acted or failed to act by and through its Principals.

263.    On information and belief, Defendants overstated certain deductions and improperly withheld monies due and owing to Plaintiff under the Marketing Agreement for the

fraudulent purpose of improperly reducing the sums Company owed to Plaintiff under the Marketing Agreement.

264.    On information and belief, Defendants withheld unapproved or unauthorized deductions from monies due and owing to Plaintiff under the Marketing Agreement for the fraudulent purpose of improperly reducing the sums Company owed to Plaintiff under the Marketing Agreement.

265.    On information and belief, Defendants understated their actual sales performance information to Plaintiff for the fraudulent purpose of improperly reducing the sums Company owed to Plaintiff under the Marketing Agreement.

266.    On information and belief, Defendants refused to disclose the geographic sales information to Plaintiff for the fraudulent purpose of either avoiding the application of the proper USDA Market News Report (i.e., published USDA Market News Report for the subject commodity closest to the geographical local of the actual sale on the actual sale date) to Company's sales performance information or for Company to improperly benefit from its use of a USDA Market News Report from an area with lower reported sales data (e.g., Miami, FL instead of Bronx, New York).

267.    On information and belief, Defendants made, for a fraudulent purpose, false or misleading statements in connection with all Produce transactions during the Growing Season by, among other things, understating sales price information, overstating deductions, claiming unauthorized deductions, withholding money to pay third parties and subsequently refusing to pay said third parties, etc.

268.    Defendants knew or should have known that Plaintiff lacked the ability to independently verify Company's Report 1 or Final Liquidation data.

269.    Defendants knew or should have known that Plaintiff relied upon Company to provide it with accurate and truthful information regarding the Produce transactions subject to the parties' Marketing Agreement.

270.    Defendant made the misstatements to Plaintiff for the fraudulent purpose of minimizing the amounts due and owing to Plaintiff under the Marketing Agreement.

271.    The foregoing actions of Defendants constitute unfair conduct under PACA.  *See* 7 U.S.C. § 499b(2), (4), and (5).

272.    Defendant's unfair conduct as defined by PACA has directly and proximately caused injury to Plaintiff in the form of, among other things, costs to lost profits and other damages in an amount to be proven at trial, plus interest and all costs of collection, including attorneys' fees.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)      Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)      Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT VII
## UNJUST ENRICHMENT
### DEFENDANTS

273.    Plaintiff re-alleges paragraphs 1 through 272 as though fully set forth herein.

274.    On information and belief, Company has converted, or is now in the process of converting, to its own use and benefit, certain monies valued in excess of $3,000,000.00.

275.    Plaintiff sold and delivered Produce to the Company, and the Company received and resold said Produce, for which it has not been paid.

276.    At all times relevant hereto, Principals were each in a position to control and manage the Company operations and had the ability to control the Company's financial dealings.

277.    At all times relevant hereto, Principals were each in a position to influence the Company's application of its operating funds and otherwise had the power to influence the application or disposition of said funds.

278.    No just cause exists in law or equity for Company to receive or retain any portion of the funds Company failed to report and pay to Plaintiff.

279.    No just cause exists in law or equity for Company to receive or retain any portion of the funds Company improperly deducted or withheld from Plaintiff.

280.    If Defendants are allowed to continue to convert and/or use the funds rightfully belonging to Plaintiff, they will be unjustly enriched to the detriment of the Plaintiff.

281.    As a direct and proximate cause of the wrongful conversion of funds due to Plaintiff, Plaintiff has been damaged and Defendants have been unjustly enriched in an aggregate amount of not less than the full value of all of the Company's full and accurate accounting for the Growing Season and the proper application of the terms of the Marketing Agreement, which is not less than $1 MM, plus claims for additional interest and attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)    Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)     Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT VIII

## BREACH OF GOOD FAITH AND FAIR DEALING UNDER PACA

### DEFENDANTS

282.    Plaintiff re-alleges paragraphs 1 through 281 as though fully set forth herein.

283.    As a PACA licensee and dealer or broker of Produce, Defendants possessed a statutory duty to deal with Plaintiff pursuant to a standard of honesty in fact and was further obligated to observe commercial standards of fair dealing in the Produce trade, which is defined, inter alia, in Section 2 of PACA.

284.    As a PACA licensee and dealer or broker of Produce, Defendants possessed a statutory duty to disclose to Plaintiff, in writing, the existence of any collateral fees and expenses[29] to all other parties to the Produce transactions where the collateral fees and expenses affect a material term of the agreement.

285.    Because the Marketing Agreement required the Company's sales performance information regarding its sale of Plaintiff's Produce to be used to calculate the final price of the Produce subject to said Marketing Agreement, any and all information regarding or reasonably relating to Company's relevant sales performance information is material to the Marketing Agreement.

286.    Because the Marketing Agreement required or otherwise authorized Company to arrange for transportation, storage, and to otherwise incur certain expenses to be deducted from the proceeds of Company's sale of Plaintiff's Produce, which directly affected the proper

---

[29] The term "collateral fees and expenses" means any promotional allowances, rebates, service or material fees paid or provided, directly or indirectly, in connection with the distribution or marketing of any perishable agricultural commodity.  7 U.S.C. § 499a(13)

calculation of Company's distribution to Plaintiff under the Marketing Agreement, any and all information regarding or reasonably relating to Company's expenses incurred or deductions taken from monies otherwise due to Plaintiff is material to the Marketing Agreement.

287.    Defendants breached their obligation of good faith and fair dealing by, among other things, refusing to account to Plaintiff, overstating deductions, taking unauthorized deductions, understating sales performance data, withholdings funds for payment of third party invoices and failing to pay said invoices, refusing to file insurance claims to recover recall and transportation expenses from an insurance policy Plaintiff paid for under the Marketing Agreement and directing Plaintiff's Produce to the least profitable sales opportunities in order to maximize the value of Defendants' own Produce, which was grown on Company owned or controlled farms such as those operated by Agro Mundial.

288.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff has been damaged in amount to be proven at trial, plus claims for additional interest and attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)    Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)    Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT IX
## INTENTIONAL INTERFERENCE WITH CONTRACT

289.    Plaintiff re-alleges paragraphs 1 through 288 as though fully set forth herein.

290.    A valid and enforceable contract existed between Plaintiff and Company.

291.    Principals took actions intended to induce a breach or disruption of the contract.

292.    There was no legal justification for the Principals' actions.

293.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff has been damaged in amount to be proven at trial, plus claims for additional interest and attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)    Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)    Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT X
## SUCCESSOR IN INTEREST LIABILITY

294.    Plaintiff re-alleges paragraphs 1 through 293 as though fully set forth herein.

295.    FQM is the successor in interest to Company having purchased all or substantially all of Company assets in or about November 2015.

296.    FQM is the recorded assignee of Company's "entire interest" in and to its "Fresh Quest" word trademark, which the United States Patent And Trademark Office ("*USPTO*") identifies as Reg. # 424494 and Serial No. 85446939 and is continuing to use the trade name to do business.

297.    FQM is the recorded assignee of Company's "entire interest" in and to its "Fresh Quest" logo, which the USPTO identifies as Reg. # 2354697 and Serial No. 75570695 and is continuing to use the trade name to do business.

298.     FQM obtained a PACA license No. 20160162 from the USDA on November 12, 2015 in order to purchase and sell Produce in interstate or foreign commerce using the "Fresh Quest" trade name.

299.     Upon information and belief, FQM acquired all or substantially all of the Company's leasehold or other interest in the farm lands used or utilized in connection with Fresh Quest's farming operations in Guatemala.

300.     Upon information and belief, FQM acquired all or substantially all of Fresh Quest's equipment, machinery and other personal assets used or utilized in connection with Fresh Quest's farming operations in Guatemala.

301.     Upon information and belief, FQM also purchased the income and accounts receivables of the Company existing on and after the closing of the transaction.

302.     Upon information and belief, FQM is continuing the business operations of Company, soliciting and doing business with the former customers of Company.

303.     Upon information and belief, FQM had knowledge, or notice of, potential liability due to Plaintiff.

304.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff has been damaged in amount to be proven at trial, plus claims for additional interest and attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)     Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)      Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT XI
## ALTER EGO, SINGLE ENTERPRISE LIABILITY
### (As to Defendant Juan Gutierrez)

305.    Plaintiff re-alleges paragraphs 1 through 304 as though fully set forth herein.

306.    As alleged above, at all relevant times herein Juan, by his complete exercise of dominion and control over Xela, Tropic, Company and Agro Mundial, is the alter ego of such entities. The foregoing entities combine to constitute a single enterprise, all under the direction and control of Juan personally. Indeed, as set forth above, there is a high interdependency of operations; there is commonality between management, directors and officers; there is a consolidation of financial, strategic, legal and human resources operations; and, at all relevant times, Juan has used and continued to use said entities and the assets of these entities for his own purposes.

307.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff has been damaged in amount to be proven at trial, plus claims for additional interest and attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)      Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)      Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT XII
## ALTER EGO, SINGLE ENTERPRISE LIABILITY
### (As to Defendant Arturo Gutierrez)

308.    Plaintiff re-alleges paragraphs 1 through 307 as though fully set forth herein.

309.    As alleged above, at all relevant times herein Arturo, by his complete exercise of dominion and control over Xela, Tropic, Company and Agro Mundial, is the alter ego of such entities. The foregoing entities combine to constitute a single enterprise, all under the direction and control of Arturo personally. Indeed, as set forth above, there is a high interdependency of operations; there is commonality between management, directors and officers; there is a consolidation of financial, strategic, legal and human resources operations; and, at all relevant times, Arturo has used and continued to use said entities and the assets of these entities for his own purposes.

310.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff has been damaged in amount to be proven at trial, plus claims for additional interest and attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)    Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)    Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT XIII
## ALTER EGO, SINGLE ENTERPRISE LIABILITY
### (As to Defendant Xela)

311.     Plaintiff re-alleges paragraphs 1 through 310 as though fully set forth herein.

312.     As alleged above, at all relevant times herein Xela, by its complete exercise of dominion and control over Tropic, Company and Agro Mundial, is the alter ego of such entities. The foregoing entities combine to constitute a single enterprise, all under the direction and control of Xela. Indeed, as set forth above, there is a high interdependency of operations; there is commonality between management, directors and officers; there is a consolidation of financial, strategic, legal and human resources operations; and, at all relevant times, Xela has used and continued to use said entities and the assets of these entities for its own purposes.

313.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff has been damaged in amount to be proven at trial, plus claims for additional interest and attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)     Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)     Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT XIV
## CONSPIRACY TO DEFRAUD

314.     Plaintiff re-alleges paragraphs 1 through 313 as though fully set forth herein.

315.     Plaintiff is informed and believes, and based thereon allege, that the Principals, and each of them, willingly and willfully conspired and agreed among themselves and with Company to perform the tortious and other wrongful acts and schemes set forth in this Complaint. Said conspiracy included, but is not limited to, the methods employed by the Principals together with Company, and each of them, to defraud Plaintiff, breach certain fiduciary duties, misappropriate the Plaintiff's money, efforts, and experience, and to conceal their wrongful actions.

316.     As a direct and proximate cause of Principals' wrongful conduct, Plaintiff has been damaged in amount to be proven at trial, plus claims for additional interest and attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)     Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)     Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

## COUNT XV
## AIDING AND ABETTING

317.     Plaintiff re-alleges paragraphs 1 through 316 as though fully set forth herein.

318.     Principals knew that Company and its officers and directors owed Plaintiff a fiduciary duty.

319.     Principals also knew that Company's directors and officers were in breach of their fiduciary duties.

320.     Principals knowingly provided substantial assistance and encouragement to the directors and officers of the Company in their breaches of their fiduciary duties.

321.     Principals therefore aided and abetted the Company's directors and officers breaches of fiduciary duties.

322.     As a result, Principals are jointly responsible with the directors and officers for the damages resulting from those breaches of fiduciary duty.

WHEREFORE, Plaintiff respectfully seeks the entry of an Order providing as follows:

A)     Entering a Final Judgment in favor of Plaintiff and against the Defendants, in an amount to be proven at trial, plus prejudgment interest and contractually due costs of collection, including attorneys' fees, incurred in this action; and

B)     Providing such other and further relief as the Court deems appropriate upon consideration of this matter.

Dated: July 11, 2016

/s/     *Drew M. Dillworth*
Drew M. Dillworth, Esq.
STEARNS WEAVER MILLER et al.
150 West Flagler Street
Suite 2200
Miami, Florida  33130
Tel: (305) 789-3598
Fax: (305) 789-3395
E-mail: ddillworth@stearnsweaver.com
*Local counsel for Plaintiff*

Of counsel:
Jason R. Klinowski, Esq.
(*Pro Hac Vice Application Forthcoming*)
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
800 Shades Creek Parkway, Suite 400
Birmingham, Alabama 35209
Tel:  (205) 874-0371
Fax: (205) 874-3287
E-mail: jklinowski@wallacejordan.com
*Lead Counsel for the Plaintiff*